39 C.C.P.A.(Patents)

**Application of ARONBERG.**

No. 5879.

United States Court of Customs and Patent Appeals.

June 30, 1952.

Rehearing Denied Sept. 30, 1952.

Frank H. Marks, Chicago, Ill. (Ivan P. Tashof, New York City, of counsel), for appellant.

E. L. Reynolds, Washington, D. C. (S. W. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, C. J., and JACKSON, O'CONNELL, JOHNSON, and WORLEY, JJ.

On Petition for Reconsideration.

GARRETT, Chief Judge.

On May 28, 1952, we sent to counsel for the parties in interest in this case a decision affirming the decision of the Board of Appeals of the United States Patent Office sustaining the rejection by the Primary Examiner of all the claims (3–6 and 9–11 inclusive) in appellant's application, serial No. 24,921, filed May 3, 1948, for a patent for "Pipe Joint Sealing Compound."

In accordance with our practice, the decision was withheld from formal publication pending the exercise of appellant's right to file any petition permissible under the rules of the court.

In due course, a petition for reconsideration was filed; the Solicitor for the Patent Office, at the request of the court, filed a memorandum *in re* the petition; and counsel for appellant made response to the memorandum.

We have re-examined the record and reconsidered the case in the light of the original and supplemental papers and have concluded that we erred in affirming the decision of the board.

Consequently, the conclusion stated in our original decision of May 28, 1952, is withdrawn and this decision, which, in stating the facts, is substantially the same as the original, is substituted for it.

Claims 3, 4, and 9 are deemed fully descriptive of the composition and physical properties of appellant's compound. They read:

"3. A pipe joint sealing compound which is solid at room temperatures and of such consistency that it may be molded into form-sustaining shape suitable as a self-applying implement which will retain rigidity when held in the human hand, comprising a homogeneous mixture of a waxy material having a melting point between about 150–200 degrees F., a drying oil present in a weight of about 100 to 400% in excess of said waxy material, and an inorganic filler in quantity sufficient to impart body to a film produced by the spreading of said compound.

"4. A product as defined in Claim 3 which is in the form of a stick of convenient size and shape for manual application.

"9. A product as defined in Claim 3 wherein the quantity of the drying oil and the quantity and the character of the filler are so adjusted that the product, when molded in a stick, is stiff and form-retaining and will remain so when subjected to human body heat from the hand for a substantial length of time and will, by oxidation in the air, form a substantial protective skin."

Claim 10, like claims 4 and 9, is dependent upon claim 3.

Claim 5 has the same meaning as claim 3, differing only as to certain phraseology, and claims 6 and 11 are dependent upon claim 5.

The rejection was based solely upon a British patent to Jean Francois Raffaelli dated January 29, 1903.

The brief on behalf of appellant asserts *inter alia:*

"Applicant's invention, as fully described in his specification and as defined in the claims at bar, comprises a caulking compound in stick form, said compound being of such composition that it will be rigidly form sustaining when held in a person's hand, despite body heat.

"Applicant's invention is a revolutionary improvement of great commercial importance in the field of pipe caulking compounds. As stated in the specification, Applicant, a Doctor of Philosophy in Chemistry from the University of Illinois, conceived of his invention primarily to overcome the

mess and inconvenience of the standard pipe thread compounds which from time immemorial have been applied to pipe threads from a can or similar container by means of a brush or stick of wood. Such materials are awkward to handle and messy, wasteful and inefficient.

\* \* \* \* \* \*

"An important feature of Applicant's invention is that, by reason of a property inherent in its composition, a relatively hard and dry 'skin' is quickly formed on the outer surface thereof upon exposure to the air. This self-forming skin thus forms a rigid envelope for the stick whereby, without the addition of any other element, the stick is retained in rigid condition; at the same time, the bulk of the material within said shell is preserved against drying out by said skin and kept in sufficiently soft condition that it may be conveniently wiped onto the pipe threads.

"Thus, it may be said that Applicant's product, as clearly set forth in the claims at bar, is, *by itself, self-sustaining, self-sealing and self-preserving.* This feature is of great importance from the standpoint of economy and practical convenience." (Emphasis quoted.)

In his specification appellant states:

" \* \* \* This application is in part a continuation of my copending allowed application, S.N. 613,011, filed August 27, 1945."

The brief on behalf of appellant makes the following statement relative to the foregoing recitation:

"For the information of this Honorable Court, it might be noted at this point that the present application is a continuation-in-part of an earlier application filed by this Applicant, which case was formally allowed. Applicant filed the present case because he had found that the formulas containing the lower melting point waxes did not meet the rigid industrial demands to which his commercial product was sub-

ject, viz., the product softened in the hand to an amorphous, puttylike consistency."

The patent so authorized is not in the record before us.

Whether the British patent upon which the claims of the instant application were rejected was considered during the prosecution of appellant's original application, serial No. 613,011, cannot be determined from the record, but this is not deemed to be of moment.

■ Appellant was within his rights in forfeiting the original authorized patent and filing the continuation-in-part application, see In re Febrey, 135 F.2d 751, 30 C.C. P.A., Patents, 1099, but the continuation-in-part application, of course, was subject to all legitimate objections found to it during its prosecution.

It appears from what is said in the brief for appellant, supra, that he forfeited the allowed patent because "he had found that the formulas containing the lower melting point waxes did not meet the rigid industrial demands to which his commercial product was subject," and he "filed the present case" to cure the defect in the formulas by the use of which "the product softened in the hand to an amorphous, puttylike consistency." As we understand the case, the claim is, in substance, as indicated in claim 9, supra, that by the formulas expressed in the new application a stick is produced which "is stiff and form-retaining," that quality being retained for a substantial length of time when the stick is held in the hand, and also that a substantial protective skin is formed "by oxidation in the air."

The findings of fact by the Board of Appeals relative to the British patent, as stated in its original decision, read:

" \* \* \* On page 1 the British patent describes a composition comprising 20 parts of wax, 50 parts of linseed oil, and 140 parts of zinc white. These proportions correspond to the proportions of the waxy material, the drying oil and the inorganic filler, as claimed herein. These claims do not specify any particular waxy material

or any particular drying oil and, hence, the composition of the particular ingredients as claimed corresponds to the ingredients disclosed in the British patent.

"Appellant stresses the melting point of the waxy material which is claimed as having a melting point 'between about 150–200 degrees F.' On page 1, line 27, the British patent states that the wax melts at 63%. This per cent mark is obviously a typographical error. On page 3, lines 4, 5, the British patent states that the wax 'melts at 145 degrees Fahrenheit.' It is obvious that the 63% mentioned on page 1 was intended to be 63° C. 63° C. corresponds to 145 degrees Fahrenheit.

"The lower limit of 150 degrees F. obviously is not critical. Examples 1 and 4 given by appellant describe a wax having a melting point of 139° F. or 140° F. On pages 3 and 6 of appellant's specification, it is indicated that the waxy material should have a melting point of at least 'about 140 degrees F.' This corresponds to the melting point of 145 degrees F. disclosed in the British patent. Furthermore, the term 'about' as used in the appealed claims evidently permits of some tolerance and we find no significant distinction between 145° and 'about 150°.' See In re Ayers, 1946, C.D. 212; 587 O.G. 337, 154 F. 2d 182. 33 C.C.P.A., Patents, 874.

"The British patent also discloses that the composition described therein may be manufactured in the shape of a solid stick having a relatively hard consistency."

From the foregoing the board concluded "that the composition and all of the physical characteristics of the compound claimed are fairly anticipated by the British patent," and continued:

"The compound disclosed in the British patent is described as being used for applying oil colors by rubbing in oil-painting work. The British patent does not disclose the use of the compound for sealing pipe joints as set forth by appellant. The limitation 'a pipe joint sealing compound,' as set forth in the preambles of the claims, is merely a statement of intended use and imports no limitations into the claims as to novel structural characteristics.

"It is well settled that a statement of a different intended use for an otherwise old composition or article cannot be considered as a limitation which adds patentability thereto. Our position in this matter is in accord with the decisions rendered in the following cases: In re Thuau, 1943, C.D. 390; 554 O.G. 14, 135 F.2d 344, 30 C.C. P.A., Patents, 979; In re Dense, 1946, C.D. 509; 591 O.G. 158, 156 F.2d 76, 33 C.C.P.A., Patents, 1171; In re Waite, 1947, C.D. 61; 596 O.G. 5, 158 F.2d 291, 34 C.C.P.A., Patents, 727; In re Benner, 1949, C.D. 367; 625 O.G. 5; 174 F.2d 938, 36 C.C.P.A., Patents, 1081; and Merit Manufacturing Company v. Hero Manufacturing Company, Inc., 2 Cir., 185 F.2d 350."

The decision of the board was rendered February 15, 1951. Thereafter a petition for reconsideration was filed on behalf of appellant, an affidavit by appellant being submitted for consideration therewith.

The petition and affidavit were discussed by the board in a second written opinion. The petition was denied insofar as it sought any change in the board's original decision.

Some of the features emphasized in the petition for rehearing and referred to in the affidavit related to the limitation with respect to the protective skin formed by oxidation of the surface of the molded stick and the limitation relating to the stiffness and "form-retaining" characteristics of the stick itself. Of these the board said:

"* * * Inasmuch as the composition disclosed in the patent to Raffaelli comprises a substantial portion of drying oil, such as linseed oil, it is apparent that the skin forming effect would be inherent in such a composition. Linseed oil, by its very nature, dries due to oxidation. While Raffaelli suggests the use of an outer coating, it is apparent that after the stick

is used, as by rubbing, and the composition is exposed to the air, an oxidized protective skin will be formed in time. Raffaelli's composition is molded in the form of a stick and is stiff and form retaining."

In our original decision after approving the findings of fact and conclusions of law stated by the board, we said:

It is true that the claims on appeal are directed to "a pipe joint sealing compound" while the patent claims are directed to an oil color seemingly for use by artists in painting pictures, but the *composition of matter* of each is substantially identical, or at least the claims on appeal do not distinguish from the subject matter defined by the patent in any material manner; that is to say, the claims on appeal read directly upon the composition of matter which the patent describes. (Italics supplied by us.)

The statement "the claims on appeal read directly upon the composition of matter which the patent describes" furnishes the actual basis for appellant's petition for reconsideration, which in effect, challenges the correctness of that holding. It is asserted in the petition that the Raffaelli product is inoperative "because it contains an ingredient not present in Appellant's product and *not included in his claims*— namely, *non-drying oil.*" (Italics appellant's.)

The petition continues:

"The Court's attention was directed at the hearing to specimens of sticks prepared strictly in accordance with the British patent and commercial samples produced under Applicant's invention, including specimens produced only a few days prior to the hearing and others which had been on file in the Patent Office for a year or more. In both the recent specimens and the older ones it was obvious that the Raffaelli sticks were soft and putty-like and incapable of being self-sustaining in a person's hand while Applicant's sticks, even those recently prepared, were stiff and form retaining.

"The practical importance of this difference in character is that, while Applicant's product quickly dries on

pipe threads to form a *fluid-tight seal, Raffaelli's will not*—and was never intended to do so, because it was conceived only for painting a picture." (Italics appellant's.)

It may aid in understanding the position of counsel for appellant upon the point stressed in the petition for reconsideration to reiterate that the British patent to Raffaelli was for improvements in the manufacture of oil color and the improvements consisted of a combination of color substances used by artists with hardened or hardening materials so that "sticks" were formed which might be used as crayons and pencils are used. The following from the provisional specification of the patent is explanatory:

"This invention relates to improvements in the manufacture of oil colors, and consists in a process which permits the manufacture of oil colors in solid and hard pieces, moulded or cast in any desired shape. Colors so manufactured are adapted to be applied by rubbing, without the use of a brush, knife, palette, or other instrument.

"These oil colors can be used for oil-painting work but particularly for the artistic painting of tableaux.

"The colors are mixed with different ingredients to give them the hard consistency and are then made into hard and solid pieces adapted to be applied by rubbing."

The provisional specification further recites:

"Amongst the oils, different *siccation* oils can be used, for instance, linseed, poppy or hemp-seed oil and other oils generally used in the preparation of oil colors. Linseed oil, the most generally used for oil colors can be selected, and a small quantity of *nonsiccative* oil added to it, such as sweet almond oil, etc. and the coloring ingredients are then added to these substances." (Italics supplied by us.)

In the complete specification it is said:

"* * * *Siccative* linseed oil, the most generally used for oil colors, may be chosen. To it may be added a small quantity of a *non-siccative* oil, such as sweet almond oil, olive oil, and the like." (Italics supplied by us.)

The definition of "siccation" given in Webster's New International Dictionary is "Act or process of drying; esp., gradual expulsion of moisture" and that of "siccative" is "*a.* Drying; causing to dry.—*n.* That which promotes drying."

In appellant's specification ten examples are set forth "as exemplifications of pipe sealing compounds" within the scope of the claimed invention. In six of the examples (Examples 1, 3, 6, 7, 9, and 10) linseed oil is named as a drying oil or siccative. In the other four perilla oil (in Examples 2 and 8), oiticica oil (in Example 4), and soya bean oil (in Example 5) are designated as drying oils or siccatives.

No one of the examples specifies a non-siccative—that is, a non-drying oil—as an ingredient of appellant's composition of matter, nor is such an ingredient mentioned in any part of appellant's specification. Each of the appealed claims specifically names a drying oil as an element of the composition and the specification supports the claims. No one of the claims specifies a non-drying oil as an element, and if any one of them did so, it would have no support in the specification.

In the memorandum of the Solicitor for the Patent Office replying to appellant's petition for reconsideration, it is suggested that appellant's statements to the effect that the Raffaelli reference includes an ingredient not included in the claims on appeal, which ingredient renders the reference product inoperative for appellant's purpose, are inaccurate for reasons stated as follows:

"First, the claims on appeal do not by their terms exclude ingredients other than those specified. Both claims 3 and 5, on which all the other claims are dependent, define the composition as '* * * *comprising* a homogeneous mixture of * * *' the specified ingredients. In view of the accepted definition of 'comprises' as an *inclusive* term (In re Horvitz, 168 F.2d 522, 35 C.C.P.A., Patents, 1239, it is obvious that the claims embrace the Raffaelli compositions which contain a non-drying oil.

"Secondly, contrary to statements made in the appellant's petition, it is not believed that the Raffaelli product 'requires the presence of a non-drying oil.' In describing this constituent (R. 28, lines 46 and 47) the patentee states: 'To it *may* be added a small quantity of a non-siccative oil * * *', indicating that the inclusion of a non-drying oil is a matter of choice, depending on the consistency desired. It should be further noted that in one of the examples on page 29 of the record lines 20 to 24 a non-drying oil is not included, the ingredients being as follows: Madder lac, 160 grammes, linseed oil 200 grammes, virgin wax 50 grammes, and Japanese vegetable wax 50 grammes." (Italics quoted.)

Inasmuch as there is no disclosure in the appellant's application of a non-drying oil, we fail to see how use of the word "comprises," although it is an inclusive term, properly may be construed to include a non-drying oil as an ingredient of the composition defined.

We think it a reasonable assumption that a non-siccative oil, such as sweet almond oil, olive oil and the like, even though the quantity was "small," was an essential ingredient of the Raffaelli composition else it would not have been included. As a non-drying substance it doubtless performed a function which so affected the hardening element of the composition as to give it characteristics defined in claim 1 of the patent which read:

"1. An oil color comprising in addition to the ordinary elements of oil color a suitable hardening element which renders the color hard to the extent of allowing it to be manipulated in the form of sticks and of executing oil paintings by direct rubbing on the pictures, without a brush or the addition of a solvent."

Appellant did not need the non-drying oil in his substance. On the contrary, such an oil was detrimental to the substance in that, as fairly may be deduced from the history of the case which has been recited herein, it harmfully affected, if it did not completely destroy, the operativeness of the composition as a pipe joint sealing compound. Appellant is seeking a substance

useful in an art wholly non-analogous to the art in which the patentee of the British patent, granted almost fifty years ago, was interested.

It should not be concluded that by our decision here we are in anywise departing from the well settled rule that discovery of a new use for an old article is not patentable.

It is our view that by eliminating or omitting the non-drying oil (the non-siccative) from the composition there was produced a new composition of matter which the British patent did not anticipate, and the record justifies the conclusion that the new composition is both novel and useful and that its production involved the exercise of the inventive faculty.

Since anticipation by the British patent constitutes the sole ground upon which the appealed claims were rejected by the tribunals of the Patent Office, and since, upon a restudy of the case, we are of opinion that the rejection on that ground was improper, it follows that the decision of the board should be reversed.

It is so ordered.

Reversed.

JACKSON, J., sat during the argument in this case but retired April 1, 1952, before the opinion was fully prepared. He was recalled in conformity with Section 294(c)(d), Title 28 U.S.C. to participate in the decision and did so.